# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

BRANDON RYAN,

        Petitioner,     :     Case No. 1:12-cv-509

- vs -     District Judge Sandra S. Beckwith
    Magistrate Judge Michael R. Merz

WARDEN, Warren Correctional Institution,

    :

        Respondent.

## REPORT AND RECOMMENDATIONS

This is a habeas corpus case brought pursuant to 28 U.S.C. § 2254 by Petitioner Brandon Ryan with the assistance of counsel. On Magistrate Judge Bowman's Order to Show Cause (Doc. No. 2), the Warden has filed a Return of Writ (Doc. No. 6) and Petitioner has filed a reply (denominated Response to Return of Writ, Doc. No. 8).

After a trial to the bench in the Hamilton County Common Pleas Court, Ryan was convicted of one count of rape and sentenced to the term of imprisonment he is now serving. Ryan pleads one Ground for Relief

> **Ground One:** The State violated Mr. Ryan's due process rights, as protected by the Fifth and Fourteenth Amendments to the U.S. Constitution, in destroying the blood evidence obtained by the State prior to indicting Mr. Ryan; the evidence was used as evidence of guilt against Mr. Ryan.
>
> **Supporting Facts**: On March 22, 2009 Brandon Ryan and codefendant Thomas Helton met up with Amber Johnson and Amber Hodges. The next day Amber Hodges went to the hospital and accused the men of rape. A rape kit was conducted by a SANE nurse. The Hamilton County Coroner office conducted tests of Ms. Hodges blood, the results of which were testified to in court by

1

> toxicologists on behalf of the State. Six months after the blood evidence was obtained by the Coroner's office, it was destroyed, per policy of the Coroner's office. Six months and one week after the blood evidence was obtained by the State, and presumably one week after it was destroyed, Mr. Ryan and Mr. Helton were indicted on charges of rape. On the second day of the trial, the State revealed that Ms. Hodges had taken prescription drugs which may have interacted with her alcohol consumption. Neither Mr. Ryan nor his counsel were ever able to independently test the blood evidence which was used against him in court.

(Petition, Doc. No. 1, PageID 5.)

**Procedural History**

Ryan was indicted on four counts of rape by the Hamilton County grand jury on August 31, 2009.  He pled not guilty, waived his right to trial by jury, and was convicted by the trial judge on one count, but acquitted on the other three.  He appealed to the First District Court of Appeals which affirmed the conviction.  *State v. Ryan*, Case No. C-100441. (Ohio App. 1st Dist. Apr. 6, 2011)(unreported, copy at Return of Writ, Ex. 9, PageID 97, *et seq*.)  The Ohio Supreme Court declined jurisdiction over a further appeal.  *State v. Ryan*, Case No. 2011-0645 (unreported, copy of Entry at Return of Writ, Doc. No. 6-1, PageID 153.)

# Analysis

The Warden concedes that Ryan's sole Ground for Relief is preserved for merit review in this Court, but contends that the First District's decision rejecting that claim is not an objectively unreasonable application of the relevant United States Supreme Court precedent, principally

2

*California v. Trombetta*, 467 U.S. 479 (1984). Ryan responds that the destruction of the blood samples of the victim, Amber Hodges, is a violation both of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Trombetta*.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

The relevant findings from the Court of Appeals are as follows:

> Unbeknownst to Hodges, Monday's mother had called Hodges's mother. Hodges's mother took her to the hospital. A sexual assault nurse examiner examined Hodges and took blood samples. She kept Hodges's dress and underwear for further examination.
>
> Three tubes of Hodges's blood and a urine sample were sent to the Hamilton County Coroner's Office. A toxicologist conducted a number of tests on the samples. One test was to detect the presence of gamma-hydroxybutyrate ("GHB") which can render a person unconscious. The toxicologists did not detect any GHB in Hodges's blood, but stated that he did not find that result to be unusual. He testified that the body eliminates GHP [sic] quickly, and that it can only be detected for a short time after it has been ingested, from "minutes to hours."
>
> A serologist and from the coroner's office testified that she had recovered DNA from semen found on vaginal and oral swabs taken from Hodges and her underwear. She compared that DNA with DNA samples from Ryan and Helton. Ryan's DNA matched the DNA profile found on all those items, but Helton's did not. The serologist also found DNA that did not match either Ryan's or Helton's.
>
> The nurse who had examined Hodges testified that she found trauma to her vaginal and rectal areas and an abrasion on her buttocks. She found three vaginal tears, one of which had been

3

oozing blood during the examination. The nurse said that the amount of tears was unusual and that consensual intercourse would not likely have caused that many tears. She also testified that she had seen similar injuries in victims of sexual assault who had been conscious during the assault and had reported that the event was physically painful.

We begin our analysis with Ryan's fourth assignment of error, in which he contends that the trial court erred in failing to grant his motion for a mistrial. He moved for a mistrial after a toxicologist from the coroner's office had testified that Hodges's blood samples were not available at the time of trial because they had been destroyed. The policy of the coroner's office was to destroy samples after six months unless the office received a request to keep them longer. Ryan argues that the State's destruction of the blood samples violated his due process rights. This assignment of error is not well taken.

The state's failure to preserve materially exculpatory evidence violates a defendant's right to due process. [Footnote omitted] The defendant bears the burden to show that the evidence was exculpatory. [Footnote omitted]

Ryan discovered at trial that, at the time of the offense, Hodges was taking a low dose of Wellbutrin, an antidepressant. He argued that the Wellbutrin could possibly have interacted with alcohol in Hodges's blood. He did not claim that it would have caused the same effect as GHB. Further, the state's toxicologist conducted a general test that would have revealed the presence of Wellbutrin in Hodges's blood, but he found no trace of it. Under the circumstances, Ryan did not show that, had the state disclosed the evidence, a reasonable probability existed that the result of the trial would have been different, or that the destruction of the evidence denied him a fair trial. Therefore he failed to meet his burden to show that the evidence was materially exculpatory. [Footnote omitted]

The failure to preserve potentially useful, but not materially exculpatory, evidence violates a defendant's due process rights if the police or the prosecution acted in bad faith. [Footnote omitted] Bad faith implies something more than bad judgment or negligence. "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." [Footnote omitted]

4

> The blood samples were destroyed under a policy of the coroner's office, and neither the prosecutor nor the police were notified. The record does not demonstrate that any state agent's conduct rose to the level of bad faith. [Footnote omitted]
>
> Consequently, the failure to preserve the blood samples did not violate Ryan's due process rights. The trial court did not err in overruling Ryan's motion for a mistrial, [Footnote omitted] and we overrule his fourth assignment of error.

*State v. Ryan*, Case No. C-100441 (Ohio App. 1st Dist. Apr. 6, 2011)(Unreported, copy at Return of Writ, Doc. No. 6-1, Ex. 9, PageID 97, *et seq*.; quotation from PageID 98-101.)

**Alleged *Brady* violation:**

Ryan's first argument is under *Brady v. Maryland, supra*. (Response, Doc. No. 7, PageID 945-951.)

There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickler v. Greene,* 527 U.S. 263 (1999); *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995).

The blood samples taken from Ms. Hodges were not, standing alone, either inculpatory or exculpatory; they had evidentiary value only if tested and with the test results presented by an expert witness. The prosecution's theory was that Ms. Hodges had been given GBH in a

5

sufficient dose to render her unconscious and that she was raped while under its influence.  Thus the presence of GBH in the samples would have been inculpatory.  But the state's toxicologist testified that there was no GBH in Ms. Hodges' blood.  No test which any defense expert could have performed on the blood could have been more exculpatory than that.

Ryan notes that the state's toxicologist testified that GBH leaves the system quickly – "more towards minutes to hours versus days."  Therefore the absence of GBH in the blood taken at the hospital the next morning was not conclusive proof that GBH had not been administered to Ms. Hodges.  If Ryan's counsel had expert testimony available that the rate of excretion was slower and that, therefore, its absence the next morning was conclusive proof that it had not been given to her, they could have produced that witness.  They had no need for independent testing. The test results for GBH – none present -- could not have been better from Ryan's perspective. Whether Ryan might have found an expert to interpret those results more favorably to him than the State's toxicologist did is beside the point because such a hypothetical expert could have worked from the test results already in hand.  There is no showing, and logically there could be no showing, that the blood itself would have yielded more exculpatory results as to the GBH.

Ryan learned from the State for the first time on the second day of trial that Ms. Hodges was prescribed a low dose of Wellbutrin, a mild anti-depressant.  As the court of appeals found, the state's toxicologist conducted a test on the blood "which would have revealed the presence of Wellbutrin in Hodges's blood, but he found no trace of it."  (PageID 100)

As contrasted with showing the absence of GBH, Ryan wanted to show the presence of Wellbutrin in Ms. Hodges' system because he hypothesized that it "could possibly have interacted with alcohol in Hodges's blood."  *Id.*  There was ample testimony Ms. Hodges had been consuming alcohol and that persons taking Wellburtrin should not consume alcohol at the

6

same time.  Since the blood had been destroyed, Ryan could no longer have it tested for the presence of Wellbutrin.

The problem with this branch of Ryan's *Brady* argument is that it is entirely speculative. He offered no evidence at trial (and did not file a petition for post-conviction relief at which evidence outside the trial record could have been considered) that there was any other kind of test which could have been run on the blood which would have been more sensitive to the presence of Wellbutrin than the test run by the State's toxicologist. He alleges that it could have been so tested, but references no evidence (Response, Doc. No. 7, PageID 949).

Moreover, Ryan's argument is also speculative about the possible effects of the Wellbutrin.  As the court of appeals noted, he did not claim it would have had the same effect as GBH.  *Id.*   As the Warden notes, the testimony at trial by the toxicologist was that if Wellbutrin were present, its interaction with alcohol would counteract the calming effects of alcohol, not amplify them, because Wellburtrin is a stimulant (Testimony quoted in Return of Writ, Doc. No. 6, PageID 36).  Ryan points to no evidence in the record to the contrary.

Ryan has not shown that it would have been possible to extract anything more exculpatory from the blood samples if they had been preserved and therefore has not established a claim under *Brady v. Maryland*.  The court of appeals conclusion to that effect is not an objectively unreasonable application of Brady and its progeny.

**Alleged *Trombetta-Youngblood* violation**

To establish a due process violation under *Trombetta*, *supra*, Ryan must show that the blood samples were destroyed in bad faith.  The record is entirely to the contrary.  The testimony

7

at trial was that the destruction happened pursuant to routine application of a Coroner's Office policy which provided for the destruction of evidence collected in potential rape cases six months after collection unless the Coroner was asked to keep the evidence.  According to Ryan, Judge Ruehlman found the policy in question to be "the stupidest thing he had ever heard of." (Response, Doc. No. 7, PageID 952, citing trial transcript at 402-04.)  However that may be, it does not equate to bad faith and the record shows the destruction took place before Ryan was indicted.  Ryan argues that Judge Ruehlman's angry reaction shows that the "destruction policy was not a normal practice."  But there is no finding by Judge Ruehlman that this was not the usual practice of this particular office nor is there any evidence that the stated rationale – lack of space to store evidence – was somehow a pretext employed in this case.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous.

October 4, 2013.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).